IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

FILED

CO MAR 21 PH 3: 17

U.D.C. .. ... COURT
N.D. .. ... AMA

CATHERINE ANN MILLER, *et al.*,          )
                                          )
          Plaintiffs,                     )          CIVIL ACTION NO.
                                          )
v.                                        )
                                          )          63-AR-574-M
UNITED STATES OF AMERICA,                 )
                                          )          **ENTERED**
          Plaintiff-Intervenor,           )
                                          )          **MAR 21 2000**
v.                                        )
                                          )
THE BOARD OF EDUCATION OF                 )
GADSDEN, ALABAMA, *et al.*,               )
                                          )
          Defendants.                     )

**MEMORANDUM OPINION**

Since 1982, when the undersigned first entered upon his duties as United States District Judge, he has been responsible for monitoring the desegregation efforts of the Board of Education of Gadsden, Alabama ("Gadsden Board"), along with several other public school systems and public educational institutions within the Northern District of Alabama. This assignment is an outgrowth of *Lee v. Macon County Board*, 221 F. Supp. 297 (M.D. Ala. 1963), which, in turn, is an outgrowth of *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753 (1955). Some of the school systems originally assigned to the undersigned have previously been recognized by this court, and by the Eleventh Circuit, as having

1



obtained "unitary status" and have been relieved of the obligations imposed upon them by prior desegregation orders. *See Lee v. Macon County Board of Education*, 681 F. Supp. 730 (N.D. Ala. 1988); *Lee v Etowah County Board of Education*, 963 F.2d 1416 (11th Cir. 1992); *Lee v. Talladega County Board of Education*, 963 F.2d 1426 (11th Cir. 1992). These findings of unitary status did not mean, and cannot mean, that the school systems that were "cut loose" have reached perfection, whether with respect to their obligation to provide a quality education to their students or with respect to their obligation to achieve a racially desegregated student and teacher population, or that they are relieved from the obligations imposed upon them by the Constitution and laws of the United States. Four of the school systems previously assigned to the undersigned, and not yet fully granted unitary status, have recently been reassigned to the newest judge of this court. This transfer of responsibility was accompanied by an unwritten quit-claim deed from the undersigned.

In 1995, the plaintiff class in the above-styled case, represented by the NAACP Legal Defense Fund, and plaintiff-intervenor, United States of America, negotiated a proposed consent decree with the Gadsden Board. This court gladly signed it, whether wisely or not. The said decree speaks for itself and will not be repeated here. It required certain things of the Gadsden Board, including the filing of periodic reports with the court.

2

Those reports were filed and were read by the court. Time passed without this court hearing any complaint from plaintiffs or from the United States.   The 1995 decree prevented the Gadsden Board from petitioning for unitary status for a period of four years while it undertook to implement the decree.  After the passage of the four year period, the Gadsden Board petitioned for unitary status.   Somehow,  an earlier plaintiff-intervenor, National Education Association, disappeared as a party.   It has not been heard from, a fact that is not given any significance by the court.

After several conferences with the parties, after considerable discovery, and after intensive briefing, an evidentiary hearing was conducted in a crowded, but not hostile, courtroom.   Both sides were afforded ample opportunity to present evidence for and against a declaration of unitary status.   The evidence received was in supplement to or in explanation of previously submitted written materials.

The Gadsden Board concedes that it has the burden of proof, although there is some dispute about what exactly the Gadsden Board is required to prove in order to obtain the relief it seeks. Plaintiffs and the United States insist that the Gadsden Board must prove more than that it has fairly complied with the 1995 consent decree.  But the essentials of what would entitle the Gadsden Board to be relieved of the prior injunctive orders are hard to get a handle on.   This only illustrates the illusiveness of the murky

3

concept, "unitary status."

After the Gadsden Board's current petition was filed, the matter was complicated by the "take-over" of Litchfield High School by the Alabama State Board of Education, which thereupon became a necessary party and, through its superintendent, Dr. Richardson, was present for, and participated in, the evidentiary hearing.  Dr. Richardson made a good witness for the Gadsden Board even though the State Board did not formally take sides.

After sifting through the evidence, both direct and circumstantial, the court finds the following facts that, in varying degrees, provide support for the Gadsden Board's request for a declaration of unitary status:

1.  After the 1995 decree, the Gadsden Board set up a Bi-Racial Committee which was commissioned to investigate all matters involving the mandated desegregation of the Gadsden schools and to advise the Board and to make recommendations to it with regard to both actual and perceived problems bearing on desegregation.

2.  After the 1995 decree, the Gadsden Board adopted a plan or plans for implementing and complying with the decree and with this court's prior orders.  For instance, it adopted a proposal as to how to increase black enrollment in advanced classes.  The degree of success of this plan is a matter of legitimate debate.

3.  After the 1995 decree, Litchfield High School, which had been historically black, was made into a "magnet school" with an

enhanced curriculum, with an improved staff and with updated instructional equipment. The purposes of magnetizing Litchfield were to entice white students to the school and to provide a superior academic setting for both black and white high school students.

4. After the 1995 decree, the Gadsden Board introduced for the first time a course or courses of study on African-American history and culture.

5. After the 1995 decree, the Gadsden Board adopted strict rules designed to prevent the transfer of students across school zone lines. Since that time, these rules have been strictly enforced, although students, both black and white, who have wanted or needed particular courses not taught at their schools have been allowed to travel to other schools across zone lines for the limited purpose of obtaining access to those courses.

6. After the 1995 decree, the Gadsden Board hired Dr. Bishop, who is black, a Ph.D. and a professor of education at the University of Alabama, to design a program and to conduct diversity and sensitivity training for the Board members and for the school system's administrative and teaching staff. Dr. Bishop is a sought-after specialist in the field of multiculturalism in the context of education, and the program that he designed for Gadsden is an ongoing program. He personally evaluates it as successful and anticipates continued improvement in the environment of the

Gadsden schools as the program continues.  He understandably does not predict that all hearts will be changed in Gadsden and all ill feelings between different racial groups will forever disappear.

7.   After the 1995 decree, the Gadsden Board increased its efforts to recruit black teachers.

8.   According to Dr. Richardson, Litchfield High School is not in as bad a shape as he expected when the State Board "took over," and he is pleased with the quality and dedication of Litchfield's current faculty and with the school's physical facilities.  He anticipates that the State Board will exit the Gadsden system at the earliest possible moment under the state-mandated guidelines that called for the State Board's intervention in the first place.

The position of plaintiffs, and of the United States, in opposing unitary status finds arguable support in the following facts, that are found to be just as true as the eight opposing facts found above:

9.   The black-to-white ratio of students enrolled in the schools operated by the Gadsden Board reflect a considerably higher percentage of blacks than there are blacks in the total population within the geographical area served by the school system.  In other words, the "racial balance" in the schools does not precisely reflect the racial make up of the general population.

10.   The Bi-Racial Committee has not met as often, or been as involved in decision making, as would be optimal for obtaining the

6

appropriate amount of input from black parents.

11.   The percentage of black students who receive corporal punishment is higher than the percentage of white students who receive such punishment.

12.   The percentage of black students who are sent to so-called "alternative schools" is higher than the percentage of white students who are sent to such schools.   In material respects, alternative schools are different from and inferior to the other schools.

13.   The attempts by the Gadsden Board to attract more black teachers has been less than successful.

14.   The course offerings at the schools that have the highest percentage of black students are not as varied or as advanced as in the schools with a higher percentage of white students.

15.   There is a disparity in the number of advanced placements as between black and white students, there being a higher percentage of whites in advanced courses.

16.   No member of the Gadsden Board would second a motion offered by one of its members, Dr. Watts, who is black, seeking to change the name of the Nathan Bedford Forrest School.   The motion died for lack of a second.

The foregoing findings of fact do not purport to resolve, or even to deal with, every dispute of fact, immaterial or material, but they do provide an adequate framework for a decision.   The

court cannot articulate all of the nuances of fact that have influenced it.   The court does have the advantage of actually having observed the cast of characters, and is frankly impressed by Dr. Taylor, the superintendent of schools.   Although there is little need to make credibility determinations, interpretations and deductions from the totality of circumstances are entirely appropriate, if not absolutely necessary to a decision; and the court hopes it brings to the task the common sense that a jury would have brought if it were deciding the ultimate issue of mixed fact and law.

The court finds it no easier to reach a decision on this evidence than the Gadsden Board has found it to satisfy the NAACP Legal Defense Fund and/or the Department of Justice, both of which have been formidable adversaries for the Gadsden Board and advocates for a denial of unitary status.  However, the court does believe that the persons who are most directly affected by what the Gadsden Board has accomplished or has failed to accomplish over the years pursuant to the prior mandates of this court are not nearly as critical of, or as disappointed in, the Gadsden Board as the present articulate and dedicated spokespersons for the plaintiffs are.

The court starts its analysis with three truisms.  The first is that there must be an end to court supervision some time. "Forever" is not an option. The second is that without divine

intervention, a perfect school system in Gadsden, or anywhere else, cannot be realized any sooner than a perfect society can be expected.  And yet, the level of cooperation, open-mindedness, and acceptance by whites of blacks and by blacks of whites in Gadsden among school administrators, teachers, board members, and students, beats by a mile what this court hears and reads about the situations in Kosovo and Northern Ireland.  The last truism, a spin-off of the second, is that almost everything, if not everything, is relative.

The Gadsden Board probably thought that if it made a bona fide effort to comply with the terms of the consent decree of 1995, it would automatically be granted unitary status after four years.  If it did think this, it was undoubtedly honest in its belief, but it was wrong.  Nevertheless, the seriousness with which the Gadsden Board undertook to comply with the terms of the consent decree of 1995 is relevant to the issue now before the court.

The fact that neither the total school population nor the school population in each Gadsden school is "racially balanced" cannot be dispositive, or even strongly indicative, either of the existence of "unitariness" or of the level of the Gadsden Boards's commitment to desegregation.  The Gadsden Board cannot be held responsible for the societal problem of residential racial separateness as it exists in Gadsden, and in most other places.  Neither can the Gadsden Board be held responsible for so-called

"white flight."   These problems plague almost every community in the United States, and, as in Gadsden, they have had a direct impact on the degree to which the desegregation contemplated by *Brown v. Board of Education* has been accomplished.   Until the federal courts learn how to make the lion lie down with the lamb, this court will be unable to make the Gadsden Board do exactly what plaintiffs and the United States would want them to do, that is, if plaintiffs and the United States actually know exactly what they want the Gadsden Board to do.   There is no figurative way to put a ring in the Gadsden Board's nose.

The bona fides of the intent of the Gadsden Board's decision makers is not dispositive in finding the answer to the question of whether this system has been satisfactorily desegregated, but there certainly must be a subjective component to the inquiry. "Attitude" must be considered as well as any objective standards that can be found for making the evaluation of the Gadsden Board's performance.   The 1995 consent decree was designed to incorporate then understood objective standards, and the Gadsden Board's level of compliance with that decree can be measured to a large extent. In this court's opinion, the Gadsden Board has done a pretty good job of meeting the standards it agreed to.

Of course, this court is not so naive as to disagree with Dr. Watts' proposition that racists still live in Gadsden.   The Gadsden school system is, of course,  located in Gadsden.   But this court

10

does disagree with the opinion of Dr. Watts, a former Gadsden board member, that the Gadsden school system is more "racist" now than it was before the 1995 consent decree.  Dr. Watts' opinion, honestly held by her, could well have been influenced by the Gadsden Board's emotionally charged rejection of her motion to rename the Nathan Bedford Forrest School.  The fact that the Gadsden Board refused to erase the name of a prominent Confederate general from a school does not prove a racist attitude by the Board.  To have passed Dr. Watt's motion would have substituted one kind of conflict for another.  General Forrest is not only identified with the founding of the Klu Klux Klan, as plaintiffs point out, but is strongly identified with a well-known episode in Gadsden's history.  To remove his name from a school as a means of effecting a salutary social policy would not prove that the Gadsden Board is a non-racist organization any more than to fail to remove it would prove to the contrary.  While the parallel to the current well-publicized conflict in South Carolina over the flying of the Confederate battle flag is obvious, and while the feelings of distinct ethnic groups in relation to what is said and done cannot be discounted, a federal court cannot award or deny unitary status on the basis of the naming or renaming of schools.  In Gadsden, Emma Sampson High School is named after a local heroine who saved Nathan Bedford Forrest's army and thereby probably prolonged the Civil War.  To carry plaintiffs' argument to its logical conclusion,   Emma

11

Sampson's name should be removed from the school that bears her name.   Where would such a line be drawn?   Too many schools in Alabama are named for Robert E. Lee and for Martin Luther King, Jr., to allow the naming of schools to become a criterion for determining whether unitary status exists.

The fact that black students in Gadsden are paddled or otherwise disciplined more often than white students is a fact that disturbed this court until it thought the matter through, albeit, with the help of the present administration in Washington.   On February 19, 2000, after this court had held its evidentiary hearing on the Gadsden Board's motion, the Associated Press reported as follows to all of its affiliated media outlets:

> A hearing on racial disparities in school discipline found enough evidence of possible discrimination to persuade a government panel to look further.  The Clinton administration contended the evidence failed to prove actions against black pupils resulted from racism.
>
> ***
>
> "A numerical disparity does not by itself prove discrimination," Norma Cantu, assistant secretary of education for civil rights, told a hearing of the U.S. Commission on Civil Rights.
>
> ***
>
> Cantu said wide racial disparities exist in the numbers of children disciplined under zero tolerance but insisted that does not necessarily mean racism is at work in the programs, as critics like Jesse Jackson contend.

In the light of what Ms. Cantu said, consistent with the explanation offered to this court by  Dr. Taylor, Gadsden Board's superintendent of education for seventeen years, the court does not

believe that the disparity in the administering of discipline, or the disparity in the Board mandated attendance at alternative schools, has been influenced by the race of the students affected.

As far as the number of black teachers is concerned, Dr. Taylor, with the full support of the Gadsden Board, has done his best to recruit more black teachers. His lack of marked success is not from a lack of trying. Rather, it results from a combination of the strenuousness of the competition among Alabama's school systems for black educators and the Gadsden Board's insistence that its teachers be qualified to teach without regard to their race. To prolong this court's supervision of the Gadsden schools until some particular percentage of teachers is black and white in the whole system and/or in each school, could put this court in a supervisory role for another fifty years.

Implicit in plaintiffs' and plaintiff-intervenor's criticisms of the Gadsden Board is a suggestion that what it has done since 1995 is cosmetic. The difference between a sandpaper job and fundamental or substantive improvement is sometimes hard to detect. Some of the things such as the sensitivity training that Gadsden Board has undertaken, may not have succeeded in changing the human hearts that make up the school system and that are more important than its buildings and playgrounds, but they are the direct product of the consent decree that was freely negotiated among the Gadsden Board, the plaintiffs, and the United States. This court is not

willing to believe that sensitivity training was or will be a waste of taxpayers' money.  Instead, it is one more attempt to attain goals difficult to reach.

This court is tempted to order a few more adjustments and to hold out the probability of a declaration of unitary status if and when those adjustments are made by the Gadsden Board, but such a course of fine tuning would only invite another dispute over whether that fine tuning has been accomplished when the time to look at them arrives.  It would only contribute to the continued micro-management of a school system by a federal court, something this court is not prepared for.

This court fully realizes that not everyone will be happy with the result reached in this opinion.  This court certainly does not depreciate "feelings."  Any person who is or becomes a victim of racial discrimination must have access to the courts, but for this court to continue to monitor the activities of the Gadsden Board under the rubric of *Lee v. Macon* would be counterproductive.  This court shares Dr. Bishop's encouraging assessment of the progress made by the Gadsden Board rather than Dr. Watts' pessimistic assessment, and will place its bets on continued progress if not on ultimate perfection.  The court hopes it is not disappointed.

An appropriate separate order will be entered.

DONE this _____ day of March, 2000.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE